DANIEL J. MOGIN (State Bar No. 95624)
JENNIFER M. OLIVER (State Bar No. 311196)
**MOGINRUBIN LLP**
One America Plaza, Suite 3300
600 West Broadway
San Diego, CA 92101
Telephone: (619) 687-6611
Facsimile: (619) 687-6610
dmogin@moginrubin.com
joliver@moginrubin.com

JONATHAN L. RUBIN (*Pro hac vice to be applied for*)
**MOGINRUBIN LLP**
1615 M Street NW, Third Floor
Washington, DC 20036
Telephone: (202) 630-0616
Facsimile: (866) 726-5741
jrubin@moginrubin.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

MED VETS INC. and BAY MEDICAL SOLUTIONS INC.,

*Plaintiffs,*

*v.*

VIP PETCARE HOLDINGS, INC., successor in interest to COMMUNITY VETERINARY CLINICS, LLC d/b/a VIP Petcare and PETIQ, INC.,

*Defendants,*

Case No.

**COMPLAINT FOR VIOLATIONS OF THE SHERMAN AND CLAYTON ACTS SEEKING PERMANENT INJUNCTION AND DAMAGES**

**JURY TRIAL DEMANDED**

Plaintiffs, MED VETS INC. ("Med Vets") and BAY MEDICAL SOLUTIONS INC. ("Bay Medical"), bring this action under the antitrust laws against defendants, VIP PETCARE HOLDINGS, INC., successor in interest to COMMUNITY VETERINARY CLINICS, LLC d/b/a VIP Petcare ("VIP"), and PETIQ, INC. ("PetIQ"), and allege:

## I.   NATURE OF THE CASE

1. This case concerns the wholesale markets for prescription and restricted OTC pet parasiticides for distribution to non-veterinary retailers. These are typically continuous use flea-and-tick and heartworm medications that are recommended by veterinarians. Approximately one third of all pet medications, with an annual wholesale value of as much as $1 billion, are sold by non-veterinary retailers, while the rest are sold by veterinary clinics. Plaintiffs seek to permanently enjoin the unlawful acquisition of defendant, VIP, by defendant, PetIQ, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and seek equitable relief and damages for price discrimination in violation of Section 2(f) of the Clayton Act, 15 U.S.C. § 13(f) and for attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

2. For years, the major veterinary pharmaceutical manufacturers—including, Merial (a division of Boehringer Ingelheim), Elanco Animal Health (a division of Eli Lilly), Zoetis, Merck Animal Health, Pfizer, and Novartis—have claimed to restrict wholesale access to pet medications to veterinary practitioners, thereby maintaining veterinarians' volume of medication sales and protecting them from retail price competition. Until now, these "veterinarian-only" distribution policies reflected a tacit but unenforceable agreement among manufacturers to keep their products off non-veterinarian retailers' shelves. Manufacturers faced with excess inventory could and did cheat with regularity, by using veterinarian-qualified wholesalers to channel excess inventory to retailers, such as PetCo, PetSmart, Costco, and Walmart. The wholesale market in which non-veterinarian retailers purchase their inventory has become known as the "secondary distribution system." In this environment, PetIQ's acquisition of VIP (the "Transaction"), a principal secondary wholesaler and owner/operator of almost 3,000 veterinary clinics and 76,000 mobile clinics, threatens to harm competition in this wholesale-to-retail pet medication distribution market. As the owner of so many veterinary practices and a major secondary wholesaler, the Transaction endows PetIQ with such substantial buying power,

in particular for prescription pet parasiticides, that the merged entity has the ability and incentive to foreclose plaintiff and other distributors from supplies, to manage, enforce, and limit secondary distribution for multiple rival manufacturers, and to attempt to create a monopoly in the wholesale-to-retail distribution channel for prescription and ethical pet medications. Accordingly, the PetIQ-VIP Transaction substantially may harm competition in the relevant market, leading to higher prices for retailers and consumers.

3. In 2011, the Federal Trade Commission ('FTC") opened an investigation into anticompetitive conditions in the U.S. market for pet medications. The FTC staff report, "Competition in the Pet Medications Industry, Prescription Portability and Distribution Practices," released in May 2015 ("FTC Report"), identified three distinct channels through which consumers purchase pet medications: i) from a veterinarian; ii) from a retail outlet supplied directly by a manufacturer or its distributor; or, iii) from a retail outlet supplied by the "secondary distribution system." The FTC Report concluded that "the secondary distribution system facilitates increased competition between veterinarians and other retailers, resulting in additional purchasing options and potentially lower prices for consumers, particularly for OTC flea and tick products." Id. at 90. In a Statement to the House Subcommittee on Commerce, Manufacturing, and Trade on April 29, 2016, the FTC stated that the secondary distribution system for pet medications "likely results in lower prices than would otherwise prevail if exclusive distribution were being strictly enforced." Today, nearly 40% of all pet medications are purchased at pharmacies, "big-box" stores, pet specialty stores, on-line merchants, and other non-veterinary retail outlets. By making a large volume of prescription and high-value OTC pet medications available to consumers for significantly lower prices than are available through veterinarians, secondary distribution has become an essential driver of competition. Accordingly, further harm to the secondary distribution system will cause substantial harm to market competition.

4. PetIQ's exclusion of rivals and emerging dominance over the pet parasiticide secondary distribution system gives manufacturers a mechanism to limit and discipline secondary distribution, results in fewer suppliers from whom retailers can purchase inventory, and deprives consumers of the benefits of robust wholesale price competition. It is in the manufacturers' interest to grant exclusive distribution rights to PetIQ, and in PetIQ's interest to accept lower volumes and higher prices that

inevitably follow from faithful compliance by manufacturers with their own restrictive distribution policies.

5. Prior to the Transaction, VIP received from Merial and other manufacturers discriminatory pricing, permitting VIP to achieve a majority share of the distribution of Merial's Frontline Plus and other manufacturer-limited OTC medications customarily supplied to retailers through the secondary distribution system. The Transaction creates the incentive and ability for PetIQ to capture additional exclusive distribution agreements and to inflict additional secondary-line price discrimination injury on plaintiffs and other, similar distributors over an even broader range of medications and to exclude plaintiffs and others from access to wholesale supply at competitive prices.

6. The Transaction therefore violates Section 7 of the Clayton Act and should be enjoined or limited. Second-line price discrimination violates Section 2(f) of the Clayton Act and attempting to monopolize the secondary distribution system for pet parasiticides violates Section 2 of the Sherman Act, for which violations plaintiffs seek equitable relief, treble damages, attorneys' fees, and costs of this action.

## II.     THE PARTIES

7. Plaintiff, MED VETS INC. ("Med Vets"), is a corporation organized, existing and doing business under and by virtue of the laws of the State of Florida, with its headquarters at 10811 Sunset Plaza Circle, Suite 406, Ft. Myers, FL 33908. Med Vets is a licensed wholesale distributor of veterinary pharmaceutical products, mostly those requiring a prescription from a veterinarian to be lawfully purchased by a consumer.

8. Plaintiff, BAY MEDICAL SOLUTIONS INC. ("Bay Medical"), is a corporation organized, existing and doing business under and by virtue of the laws of the State of Florida, with its headquarters at 10811 Sunset Plaza Circle, Suite 406, Ft. Myers, FL 33908. Bay Medical, under common ownership with Med Vets, is a wholesale distributor of OTC pet medications, principally, Frontline Plus, a market leading flea-and-tick control parasiticide.

9. Defendant VIP PETCARE HOLDINGS, INC., successor in interest to COMMUNITY VETERINARY CLINICS, LLC d/b/a VIP Petcare ("VIP"), is a corporation organized, existing and doing business under and by virtue of the laws of the State of California, with its headquarters at 5813

Skylane Blvd., Windsor, CA 95401. VIP operates 2,900 veterinarian clinic locations and 76,000 mobile clinics and employs over 1,400 veterinarians in 31 states. According to press reports, when VIP acquired PawsPlus in November 2014, the deal created the largest single provider of veterinary care in the country.

10. Defendant, PETIQ, INC. ("PetIQ"), is a publicly-held corporation organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its headquarters at 500 E. Shore Drive, Suite 120, Eagle, ID 83616. PetIQ is also a wholesale distributor of OTC pet medications and manufactures and distributes a line of "generic" versions of well-known pet medications and products. PetIQ distributes such products to Walmart, Target, Kroger, Albertsons, Publix, Meijer, Costco, Sam's Club, BJ's Wholesale Club, PetSmart, PetCo, Phillips Pet Food and Supplies, Animal Supply Co., Amazon.com, Chewy.com, Walmart.com, Jet.com, PetSmart.com, PetCo.com, and others.

## III.   JURISDICTION AND VENUE

11. This court has subject matter jurisdiction and jurisdiction over the parties pursuant to 28 U.S.C. §§ 1331 and 1337 and over the federal antitrust claims asserted herein under Section 16 of the Clayton Act, 15 U.S.C. § 26, Section 4 of the Clayton Act, 15 U.S.C. §15, Section 7 of the Clayton Act, 15 U.S.C. § 18, Section 2 of the Clayton Act, 15 U.S.C. § 13, and Section 2 of the Sherman Act, 15 U.S.C. § 2.

12. Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, in that this case involves the acquisition of the ownership of VIP, a California domestic corporation. Both defendants are found and transact business in the Northern District of California and throughout the United States.

## IV.   TRADE AND COMMERCE

13. Defendants are engaged in "commerce," as defined in Section 1 of the Clayton Act, 15 U.S.C. § 12(a). The sale of pet medications at wholesale is a distinct "line of commerce" within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18. Defendants' transactions and conduct has and will have a substantial, direct, and reasonably foreseeable effect on interstate commerce. The goods referred to herein as being the subject of price discrimination were sold across state lines.

## V. THE TRANSACTION

14. Pursuant to an agreement announced on January 8, 2018 and consummated on January 17, 2018, defendant, PetIQ, through a wholly-owned subsidiary, acquired the veterinary and wholesale distribution business of defendant, VIP, a national chain of 2,900 veterinary clinics, 76,000 mobile veterinary clinics, and 29 regional offices. On March 13, 2018, the merged entity announced plans to open an additional 1,000 veterinary clinics. With the acquisition of VIP's wholesale distribution of Frontline Plus, the merged entity has become the dominant supplier of restricted OTC pet parasiticides to retailers through the secondary distribution system.

15. On March 15, 2018, Susan Sholtis, formerly the head of North American commercial operations for Merial, was appointed by PetIQ to its Board of Directors.

16. The merged entity will have the ability and incentive to dominate and monopolize the secondary distribution system for veterinary medications. Moreover, manufacturers stand to benefit from the creation of a dominant gateway and greater control over secondary distribution to retailers. The Transaction violates Section 7 of the Clayton Act because it may substantially lessen competition in the wholesale supply of veterinary medications to non-veterinarian, consumer retail outlets.

## VI. THE SECONDARY DISTRIBUTION SYSTEM

17. Pet parasiticides, predominantly flea-and-tick control products and heartworm preventatives, are health maintenance medications requiring continual use, so consumers must purchase them repeatedly. As a result, parasiticides consistently report the highest unit sales volume and highest revenue among all categories of pet medications. For example, sales of fipronil-based, "spot-on" products, such as Merial's Frontline Plus, were approximately $250 million in 2016, while Merial's prescription chewable flea-and-tick preventative, NexGard, had sales of about $200 million. Other popular products in the category are manufactured by a small group of pharmaceutical companies (Merial, Elanco, Zoetis, Merck, Bayer, Novartis, and Dechra/Putney).

18. With the notable exception of Bayer Animal Health, these manufacturers all have stated policies that restrict distribution of prescription and certain OTC medications to veterinarians for sale to the public. Nevertheless, some 38% of all pet medications, including prescription and supposedly restricted OTC pet parasiticides, are sold at pharmacies, big-box stores, pet specialty stores, or on-line.

19. Bayer Animal Health is the only major veterinary pharmaceutical manufacturer that has broken from the pack by openly supporting the sale of its pet medications by pharmacies and on-line merchants. In February 2010, Bayer announced an end to its decades-old policy of selling its Advantage and K-9 Advantix flea and tick prevention products exclusively through veterinarians. Bayer's rival, Eli Lilly's Elanco, responded with a widely-disseminated call-to-arms in a letter to U.S. veterinarians, stating:

> Your business is at a crossroad. Will you stand by and watch while industry "leaders" redirect patients outside your office for veterinary products? Will you endorse companies which disrespect your profession and redirect patients to other sources? Or will you support companies whose words are supported by action? At Elanco, we believe it is critically important to align actions and words. We believe our unwavering commitment to veterinarians, demonstrated through innovative product introductions and methods of keeping our products within the veterinary channel, demonstrate our support to you and your practice.

20. Bayer sued Eli Lilly over the disparaging statements in the letter, claiming false advertising and unfair competition. (Southern District of New York Case No. 1:11-cv-03047-AKH, filed May 4, 2011). In the Consent Decree terminating the case, Lilly (including its sales force, employees and agents) were required to refrain from making or disseminating any of the following statements:

> a. That there is a direct correlation between Bayer's sales of pet medicines through retail stores and a decline in veterinary-dispensed flea medication; or
> b. That Bayer does not support veterinarians; or
> c. That Elanco's pet medicines cannot ever be purchased by pet owners from internet pharmacies; …

21. The last stipulation corrects Elanco's claim that it "aligns actions with words," which is belied by the fact that Elanco's Comfortis, an oral flea treatment for dogs and cats, and other medications were and remain available for purchase through a number of non-veterinarian Internet pharmacies, including 1800petmeds.com and drsfostersmith.com. As Bayer summarized in its Complaint, although sales "to th[e] non-veterinary market violated the terms of Bayer's and Elanco's sales policies, this practice was and is common in the sale of many pet medicines."

22. Merial manufactures Frontline Plus, which it represents as the best-selling veterinary product in the world. Frontline Plus is a continual use parasiticide for dogs and cats containing the active

ingredients fipronil and methoprene. As the top-selling pet flea and tick parasiticide purchased at *retail* year after year, Frontline Plus became the only true "blockbuster" pet medication in history, attaining global sales of almost $ 1 billion in the years before Merial's patents began to expire and imitators (one of which was PetIQ) began to enter the retail market.

23. When Bayer decided to supply retailers directly, Merial also responded with a letter to veterinarians. Merial's then U.S. Operations President wrote, "Merial's policy has always been to sell Frontline products only to licensed practicing veterinarians. I want to personally assure you that this policy remains unchanged. So if you hear that Frontline products are 'going OTC,' it isn't true."

24. The letter was met with incredulity by most veterinary practitioners, who were fully aware that Frontline products were widely available at Costco, PetSmart, and Petco and from e-commerce merchants, such as PetMed Express. An article in 2010 in the veterinary industry publication VIN News Service suggested that Merial knowingly misrepresented its distribution policies. The company even appeared to concede that its distribution policies were bereft of any legitimate business purpose, other than to vie for the loyalty of veterinarians by paying lip service to a policy observed in name only. A Merial executive also reportedly asserted that the antitrust laws were limiting the company's ability to "aggressively enforce" its policy, because retail sales are not illegal and because Frontline is the market leader, putting them under "particular scrutiny to avoid breaking laws against restraint of trade, anti-competitive behavior." The Merial executive was quoted as saying:

> We're caught between having a sales policy that we enforce and legal constraints that dictate that we must be extremely careful how we enforce it. It may sound like a story we're concocting. We haven't raised it much before because it's a legalistic argument, and I'm afraid people may not understand the extent to which this is a very important concern.

Yet, Merial for years had maintained so-called "Zulu" accounts free of sales commissions to facilitate the flow of Frontline Plus into the secondary distribution system, thereby supplying the necessary inventories to maintain the product's leading retail sales position.

25. Pet parasiticide manufacturers continue formally to insist that distribution of their products is limited to veterinarians, even as large proportions of these products are sold by non-veterinarian retailers. This holds for supposedly restricted OTC pet medications as well as medications

sold only by prescription, which are also available at non-veterinarian retailers through the secondary distribution system (all licensed and authorized pharmacies are also authorized to dispense prescription pet medications). Manufacturer policies that seek to restrain the volume of distribution to retail outlets have no legitimate purpose and merely serve to enable manufacturers artificially to limit supply to maintain prices above their competitive levels. As manufacturers "cheat" on restrictive distribution policies by siphoning off excess inventory into retail sales, however, the intended effect of those policies is diminished. This trend can be reversed by ensuring that PetIQ emerges as a dominant secondary wholesaler willing to facilitate greater manufacturer discipline and control over secondary distribution in exchange for exclusive distribution rights.

## VII. VETERINARY PRESCRIPTION NON-PORTABILITY

26. Unlike prescription drugs for humans, which are prescribed by doctors but sold only by pharmacies, there are no statutory or regulatory restrictions on the right of veterinarians to dispense pet medications, so veterinarians both prescribe and sell prescription as well as high-value OTC pet medications. A financial conflict of interest exists when the exclusive legal right to prescribe is combined with *de facto* exclusive authorization to dispense. In such an environment, competition in the market for pet medications can be severely distorted when manufacturers restrain retail supplies.

27. To purchase prescription pet medications from a retailer, a consumer must first obtain a "portable" prescription from their veterinarian. Although many veterinarians provide portable prescriptions to clients upon request, the FTC observed that "complaints persist that some veterinarians do not always comply with requests for prescriptions." *FTC Report*, at 18. For this reason, federal legislation has been introduced on several occasions to require veterinarians to provide portable prescriptions for every medication they prescribe. (*See, e.g.*, Fairness to Pet Owners Act of 2011, H.R. 1406, 112th Cong. (2011); Fairness to Pet Owners Act of 2014, H.R. 4023, 113th Cong. (2014); and Fairness to Pet Owners Act of 2014, S. 2756, 113th Cong. (2014)). Such legislation is intended to enable pet owners to shop for the best prices for pet medications.

28. However, as the FTC recognized, even achieving universal portability of pet medication prescriptions is unlikely to enhance competition in the presence of restrictive manufacturer distribution policies. Indeed, maintaining the secondary distribution system and the availability of prescription

medications from non-veterinary retailers is necessary for any improvement in veterinary prescription portability to have a pro-competitive effect. With the constriction or disappearance of the secondary distribution system, therefore, no degree of prescription portability can prevent manufacturers and veterinarians from limiting prescription pharmaceutical dispensing to veterinary clinics, to the exclusion of licensed pharmacies and other lawful retailers. Accordingly, the PetIQ-VIP merger threatens to undermine the effectiveness of any legislation intended to promote prescription portability that may be passed by Congress or state legislatures.

## VIII.   THE RELEVANT MARKET

29. The relevant lines of commerce and product markets in which to analyze the effects of PetIQ's acquisition of VIP and defendants' antecedent anticompetitive conduct are the wholesale markets for prescription and restricted pet parasiticides for distribution to non-veterinary retailers (the secondary distribution system for prescription and restricted OTC pet parasiticides, respectively). Other pet products, such as those distributed directly to retailers, are not sufficiently substitutable to discipline at least a small but significant and non-transitory increase in the wholesale price of prescription and restricted pet parasiticides in the market, and relatively few retailers would substantially reduce their purchases of such medications in the event of such a price increase. Therefore, a hypothetical monopolist distributor in each of the relevant markets likely would increase its prices by at least a small but significant and non-transitory amount.

30. The relevant geographic market for analyzing the effects of the Transaction is the United States.

## IX.   THE DEFENDANTS' OTC WHOLESALING JOINT VENTURE

31. Defendant, PetIQ, claims to provide "consumers convenient access and affordable choices to a broad portfolio of pet health and wellness products across a network of leading national retail stores in mass, club, grocery, pharmacy, and e-commerce channels." The majority of its revenue is earned by distributing third-party pet medications that are marketed directly to pet owners and routinely stocked by retailers, rather than medications recommended and sold by veterinarians.

32. Defendant, VIP, employs over 1,400 veterinarians in 2,900 clinics and wellness centers in 31 states. Due to the scale of its practice, VIP is granted substantial manufacturer allotments of

veterinary pharmaceuticals. The company utilizes its access to prescription pet medicine supplies to sell those products at wholesale into the secondary distribution system. From 2016 to the present, VIP knowingly induced and received discriminatory prices from Merial and Elanco on large quantities of restricted OTC pet parasiticides for the retail market at prices which, for a like grade and quantity, were not available to plaintiff or other distributors.

33. A VIP sales representative informed one of plaintiffs' executives in March 2017 that VIP had been granted an exclusive by Merial to be the sole distributor to the retail market of Frontline Plus, the market leading pet parasiticide.

34. With access to manufacturers' supplies at deeply discounted prices not reasonably contemporaneously available to other wholesalers or distributors, VIP partnered with PetIQ to market to the secondary distribution system. In the years between 2012-2016, Bay Medical had distributed approximately 10% of Merial's Frontline Plus to retailers such as PetSmart, Petco, and 1-800-PetMeds. However, by 2017, all of Bay Medical's contracts with those retailers had been lost to the VIP-PetIQ joint venture, which had the ability to exclude rival distributors by exploiting VIP's supply of Frontline Plus at deeply discounted prices unavailable to other distributors and PetIQ's numerous existing relationships with retailers.

35. Subsequent to the VIP acquisition, on March 19, 2018, PetIQ appointed Susan Sholtis as a member of its Board of Directors. PetIQ's press release announcing the appointment describes Ms. Sholtis as the former "Head of North America Commercial Operations at Merial … responsible for transitioning North America operations to Merial's new owner, Boehringer Ingelheim" and as having "spent eight years at Merial beginning in 1996 where she most recently had global responsibility for managing two of the largest brands in animal healthcare, FRONTLINE® and HEARTGARD®."

36. Subsequent to the VIP acquisition, on March 13, 2018, PetIQ announced the opening of 1,000 additional veterinary services clinics, including clinics in 20 Walmart store locations.

## X. ANTICOMPETITIVE EFFECTS

37. As a result of the Transaction, the combined company possesses considerable capacity and opportunity to purchase large quantities of prescription pet parasiticides through its veterinary clinics, and plans to increase such capacity with the opening of an additional 1,000 veterinary clinics in

the near future. Endowed with VIP's wholesale access to such large quantities of prescription pet medications and PetIQ's comprehensive relationships with retailers, the combined company has the capacity to gain a monopoly share of the secondary distribution system for prescription pet parasiticides. The market for prescription parasiticides is vulnerable because it is already highly concentrated. Plaintiffs estimate that in 2017, VIP distributed over 27% of the prescription pet parasiticides sold by non-veterinary retailers, compared to about 25% of retailer-sold medications that were sourced from all other U.S. veterinarian-wholesalers combined. Other key wholesalers of prescription products to non-veterinary retailers include Southeastern Veterinary Exports (a captive distributor to 1-800-Petmeds) (33%), Lambert Vet Supply (5%), Rainbow Vet Supply (4%), Pet Vet Supplies (2%), and plaintiff, Med Vets (4%). Should defendants receive discriminatory pricing or exclusive distribution agreements for prescription pet parasiticides similar to the discriminatory pricing and exclusive agreements received for restricted OTC medications, rival distributors, such as plaintiff and other distributors, including Lambert, Rainbow, and Pet Vet, are likely to be foreclosed from a competitive source of supply and forced to exit the market. PetIQ's resulting dominant position benefits manufacturers by consolidating control of secondary distribution for multiple rival manufacturers, but deprives retailers of a competitive choice of wholesale distributors and consumers of the benefits of unfettered competition in the wholesale market.

38. As a result of defendants' past conduct, non-veterinary retailers have been deprived of numerous choices of wholesale supply of Frontline Plus and other OTC medications and consumers have been deprived the benefits of a competitive wholesale market. By knowingly receiving discriminatory prices, defendants inflicted a secondary-line injury on the wholesale-to-retail market for restricted OTC pet medications, as plaintiff, Bay Medical, and other distributors of those products were forced to exit the secondary market. The FTC has determined that the secondary distribution system is necessary for effective price competition. Harm to the secondary distribution system, therefore, constitutes substantial harm to competition in the pet medication market.

39. Because defendants' transaction threatens to establish a common secondary distributor for several competing veterinary pharmaceutical manufacturers, it is likely to result in reduced secondary distribution and, therefore, lower volumes of medications available to non-veterinarian

retailers. Such arrangements are also likely to facilitate inter-brand coordination on price and engender other coordinated effects.

40. Entry of new secondary distributors into the relevant markets is unlikely to prevent or remedy the anticompetitive effects of defendants' transaction or conduct. Such wholesaling requires veterinary licensing and other regulatory authorizations and product for distribution, in part due to the anticompetitive conduct described in this action, which severely limits the availability of wholesale supplies, and in part because a new entrant would find it practically impossible to establish and cultivate the business relationships necessary to purchase product at wholesale prices.

41. The Transaction is unlikely to generate verifiable, merger-specific efficiencies in the relevant markets sufficient to reverse or outweigh the anticompetitive effects that are likely to occur and have occurred. The parties have demonstrated their ability jointly to market pet medications through contractual arrangements; co-ownership creates no additional or unique improvements or greater efficiencies. Any savings resulting from the parties' transaction will inure only to the profits of the enterprise and will result in no price or non-price consumer benefits.

42. For years, pet medication manufacturers have known that artificial restraints on the distribution of pet medications through "veterinarian only" distribution policies risks exposing them to antitrust liability. The restrictive, discriminatory, and exclusionary arrangements facilitated by the defendants' challenged transaction, which in the process lower output and raise prices, also violate the antitrust laws. Industry participants should not be permitted to accomplish indirectly what the antitrust laws prohibit from accomplishing directly.

43. Accordingly, the Transaction substantially may lessen competition in the secondary distribution system for prescription pet parasiticides and is likely to lower the output and raise the prices of prescription pet parasiticides. Moreover, defendants' antecedent conduct has harmed competition in the secondary distribution system for restricted OTC pet parasiticides. Those combined anticompetitive effects create a dangerous probability that defendants will succeed in monopolizing the secondary distribution system for pet parasiticides.

**XI. ANTITRUST INJURY**

44. As a direct, proximate, and foreseeable result of defendants' transaction and antecedent conduct, plaintiffs have been injured in their business and property or are threatened with such injury. Plaintiff, Bay Medical, has been excluded from the wholesale market for the distribution of restricted OTC pet parasiticides to non-veterinarian retailers. Plaintiff, Med Vets, is threatened with exclusion from the wholesale market for the distribution of prescription pet parasiticides to non-veterinarian retailers and has no adequate remedy at law.

45. As a direct, proximate, and foreseeable result of defendants' transaction and antecedent conduct, competition in the relevant markets has been harmed and reduced. In addition to the exclusion of plaintiffs and other secondary wholesalers, the volume of pet medications distributed through non-veterinary retailers will decrease and prices to consumers will rise. Further, retailers are threatened with a significant loss of wholesale purchasing options.

**XII. VIOLATIONS ALLEGED**

46. Plaintiffs incorporate the allegations of paragraphs 1 through 37 above as if fully set forth in each Count herein.

**<u>COUNT I</u>**

**(Unlawful Merger in Violation of the Clayton Act § 7)**

47. Plaintiffs bring Count I of this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain the defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. The likely effect of the Transaction will be to lessen competition substantially in interstate trade and commerce in both relevant markets throughout the country, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

48. Plaintiffs are threatened with the loss of their business and property and other irreparable harm from the violation and have no adequate remedy at law.

**<u>COUNT II</u>**

**(Second-Line Price Discrimination in Violation of the Clayton Act § 2(f))**

49. Plaintiffs bring Count II of this action under Section 4 of the Clayton Act, 15 U.S.C. § 15 and Section 16 of the Clayton Act, 15 U.S.C. § 26, for damages and injunctive relief against

defendants for violating Section 2(f) of the Clayton Act, 15 U.S.C. § 13(f), by inducing or receiving a discrimination in price prohibited by Section 2 of the Clayton Act.

50. Defendants engaged in two or more transactions of goods at significantly lower actual net prices than were functionally and reasonably contemporaneously available to plaintiff or other distributors for a like grade and quality under like terms of delivery.

51. The differences in price did not reflect any differences in costs and was not otherwise justified by any increase in cost.

52. The difference in price was not a response to changing market conditions or for the purpose of meeting the competition.

53. Defendants' inducement or knowing receipt of the discrimination in price caused competitive injury in the market for wholesale-to-retail distribution of restricted OTC pet medications in the form of secondary-line injury to competition following the exit of plaintiff, Bay Medical, and other distributors from the market.

54. As a direct and proximate result of the foregoing, plaintiffs have lost their business and property and are threatened with additional loss and injury for which there is no adequate remedy at law.

**COUNT III**

**(Attempted Monopolization in Violation of the Sherman Act § 2)**

55. Plaintiffs bring Count III of this action under Section 4 of the Clayton Act, 15 U.S.C. § 15 and Section 16 of the Clayton Act, 15 U.S.C. § 26, for damages and injunctive relief against defendants for violating Section 2 of the Sherman Act, 15 U.S.C. § 2. Defendants' transaction and antecedent conduct and create a dangerous probability that defendants will succeed in monopolizing the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, as described herein.

56. As a direct and proximate result of the foregoing, plaintiffs have lost their business and property and are threatened with additional loss and injury for which there is no adequate remedy at law.

## XIII. RELIEF REQUESTED

WHEREFORE, plaintiffs request the following relief:

A. A declaration that the Pet IQ acquisition of VIP violates Section 7 of the Clayton Act, 15 U.S.C. § 18;

B. A preliminary order enjoining defendants from proceeding to integrate the acquired companies into the operations of PetIQ and requiring defendants to hold the assets acquired in the transaction separate during the pendency of this litigation;

C. A temporary order enjoining defendants from soliciting additional contracts from veterinary pharmaceutical manufacturers without prior notification to the Court and to plaintiffs;

D. A permanent order requiring PetIQ to divest its interests in VIP and for a novation of the January 17, 2018 acquisition;

E. Three-fold damages directly and proximately caused by defendants' anticompetitive conduct, price discrimination, and attempted monopolization of the relevant markets;

F. An order awarding a reasonable attorneys' fee and the costs of this suit; and,

G. Such other further temporary and permanent equitable relief as may be reasonably necessary.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury of all issues so triable.

Dated: April 4, 2018

*/s/ Daniel J. Mogin*

DANIEL J. MOGIN (State Bar No.95624)
JENNIFER M. OLIVER (State Bar No. 311196)
MOGINRUBIN LLP
One America Plaza, Suite 3300
600 West Broadway
San Diego, CA 92101
Telephone: (619) 687-6611
Facsimile: (619) 687-6610
dmogin@moginrubin.com
joliver@moginrubin.com

JONATHAN L. RUBIN (*Pro hac vice to be applied for*)
MOGINRUBIN LLP
1615 M Street NW, Third Floor
Washington, DC 20036
Telephone: (202) 630-0616
Facsimile: (866) 726-5741
jrubin@moginrubin.com

*Counsel for Plaintiffs*