Daniel J. Mogin (SBN 95624)
Jodie M. Williams (SBN 247848)
Jennifer M. Oliver (SBN 311196)
**MOGINRUBIN LLP**
One America Plaza, Suite 3300
600 West Broadway
San Diego, CA 92101
Telephone: (619) 687-6611
Facsimile: (619) 687-6610
dmogin@moginrubin.com
jwilliams@moginrubin.com
joliver@moginrubin.com

Jonathan L. Rubin (*Pro hac vice*)
**MOGINRUBIN LLP**
1615 M Street NW, Third Floor
Washington, DC 20036
Telephone: (202) 630-0616
Facsimile: (866) 726-5741
jrubin@moginrubin.com

*Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MED VETS INC. and BAY MEDICAL SOLUTIONS INC., | Case No. 3:18-CV-02054-MMC |
| *Plaintiffs,* | **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN AND CLAYTON ACTS SEEKING PERMANENT INJUNCTION AND DAMAGES** |
| *v.* | |
| VIP PETCARE HOLDINGS, INC., successor in interest to COMMUNITY VETERINARY CLINICS, LLC d/b/a VIP Petcare and PetIQ, INC., | **JURY TRIAL DEMANDED** |
| *Defendants.* | Judge: Hon. Maxine M. Chesney |

Plaintiffs, MED VETS INC. ("Med Vets") and BAY MEDICAL SOLUTIONS INC. ("Bay Medical"), bring this action under the antitrust laws against defendants, VIP PETCARE HOLDINGS, INC., successor in interest to COMMUNITY VETERINARY CLINICS, LLC d/b/a VIP Petcare ("VIP"), and PETIQ, INC. ("PetIQ"), and allege:

## I.        NATURE OF THE CASE

1.        Plaintiffs allege that the acquisition of VIP by PetIQ violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 2 of the Sherman Act, 15 U.S.C. § 2. The merger removes an independent competitor, VIP, from the market, the effect of which may be substantially to lessen competition or tend to create a monopoly in a line of commerce, *to-wit*: the wholesale distribution to non-veterinary retailers of unmeasured veterinary wellness and medication products.

2.        Most products available at retail stores and through on-line forums are "measured." However, most veterinary wellness and medication products are "unmeasured." Measured products are those that are tracked by retail measurement services such as The Nielsen Company (US), LLC ("Nielsen").  Firms such as Nielsen aggregate point of sale (POS) data from store checkout scanners, employ field auditors to collect sales data through in-store inventory and price checks, and analyze data about internet commerce.  Unmeasured products are available in retail stores such as Petco, PetSmart, Wal-Mart or Sam's Club, but sales of these products are not tracked by firms such as Nielsen. Most or all of the products served by the relevant market in this case are preventative medications designed to protect animals against fleas, ticks, heartworm, and infection, both prescription and non-prescription, that are "unmeasured" products.

3.        The principal channel through which unmeasured preventative pet medications reach retailers is through veterinarian practices that choose to resell pet medications to the wholesale market rather than directly to the public. This practice historically has been referred to as "diversion," and the veterinarians that resell pet medications for distribution into the retail channel have been referred to as "diverters." Plaintiffs Med Vets and Bay Medical are diverters with a wholesale veterinary pharmacy license to sell unmeasured pet medications, as is VIP.  Historically, VIP, which also operates veterinary clinics and mobile vaccination facilities, has been a significant diverter of veterinary wellness and medication products and has served as an important independent wholesale source for distributors.

FIRST AMENDED COMPLAINT (Sherman and Clayton Acts)

Historically, PetIQ, has been a distributor of pet products to virtually every significant retailer in the U.S. In combination, the two firms are using VIP's veterinarian status to acquire large quantities of unmeasured pet wellness and medication products for the purpose of re-selling or "diverting" them to PetIQ for sale to retailers, thereby foreclosing competition from other wholesaler/distributors. After their first quarter of operations, the combined entity claimed to control over 90% of the wholesale market for unmeasured pet wellness and medication products.

4.     The presence of unmeasured pet wellness and medication products on retailer's store shelves and in on-line fulfillment centers is due to historical reasons. For years, the avowed policy of the major veterinary pharmaceutical manufacturers—including, Merial (currently a division of Boehringer Ingelheim), Elanco Animal Health (a division of Eli Lilly), Zoetis, Merck Animal Health, Pfizer, and Novartis—has been to distribute their animal health medications solely through veterinary clinics and practitioners, or through dispensing pharmacies where the pet owner has obtained a portable prescription.[1] Animal health manufacturers refused to sell their products to retailers directly. As a result, these products are supposed to be sold only by veterinary clinics and pharmacies and not through non-veterinary retail stores. They are therefore not tracked by Nielsen or other retail measurement firms and are thus "unmeasured."

5.     However, in spite of the manufacturers' avowed policies, veterinary wellness and medication products did and do appear on retail shelves. They do so through the unconventional wholesale distribution to non-veterinary retail channel, which explains why pet wellness and medication products are unmeasured retail products. Defendants' public filings recognize that the wholesale distribution to non-veterinary retailers of unmeasured veterinary wellness and medication products constitutes and defines a separate and distinct line of commerce.

6.     The manner in which the pet wellness and medication market operates and are distributed has garnered the attention of the federal antitrust authorities. In 2011, the Federal Trade Commission opened an investigation into competition in the U.S. market for pet medications. The resulting report, entitled "Competition in the Pet Medications Industry, Prescription Portability and Distribution

---

[1] A notable exception is Bayer Animal Health, which discontinued its veterinarian-only distribution policy in 2010. *See* ¶ 26, *infra*.

FIRST AMENDED COMPLAINT (Sherman and Clayton Acts)

1   Practices," was released in May 2015 ("2015 FTC *Report*"). Among other things, the 2015 FTC *Report*
2   updated the industrial nomenclature, referring to diverters as "secondary distributors" and the
3   mechanism by which pet wellness and medication products are supplied to retailers as the "secondary
4   distribution system."

5          7.     The 2015 FTC *Report* stated that "the secondary distribution system [i.e., the group of
6   wholesalers that channel product from veterinarians to retailers] facilitates increased competition
7   between veterinarians and other retailers, resulting in additional purchasing options and potentially
8   lower prices for consumers, particularly for OTC flea and tick products." *Id*. at 90. In a Statement to the
9   House Subcommittee on Commerce, Manufacturing, and Trade on April 29, 2016, the FTC stated that
10   the secondary distribution system for pet medications "likely results in lower prices than would
11   otherwise prevail if exclusive distribution were being strictly enforced."

12          8.     Defendant PetIQ, has been a significant player in the secondary market. As the company
13   stated in the 2018 Annual Form 10-K it filed with the Securities Exchange Commission on March 13,
14   2018, "We [PetIQ] pioneered and are the *leading seller to the retail channel* of pet products that were
15   *previously available for purchase primarily from veterinary clinics*." (emphasis added). These products
16   are the same unmeasured veterinary wellness and medication products sold to retailers through the
17   secondary market described above.

18          9.     On January 17, 2018, PetIQ acquired VIP in a transaction valued at $220,000,000.

19          10.    Prior to the challenged acquisition by PetIQ, defendant VIP engaged in two lines of
20   commerce. On the one hand, "[t]he company provides veterinary care to pet owners through their
21   nationwide network of community clinic locations and wellness centers within the United States." PetIQ
22   Form 8-K/A, Exhibit 99.1, at 9/20, filed April 2, 2018. On the other hand, "The company *is also a*
23   *wholesale distributor* of *pet care products*." *Id.* Because of its clinical operations, VIP enjoys unfettered
24   access to veterinary wellness and medication products and resold these products at wholesale. Thus,
25   prior to the acquisition, VIP was an independent competitor in the secondary distribution system, and
26   the products it distributed were unmeasured veterinary wellness and medication products.

27          11.    Because of the challenged transaction with VIP, PetIQ has acquired unfettered access to
28   unmeasured pet wellness and medication products. By removing VIP as a horizontal competitor, and

FIRST AMENDED COMPLAINT (Sherman and Clayton Acts)

acquiring its supply of veterinary wellness and medications, PetIQ has come to dominate the secondary distribution market and forced other secondary distributors to exit by virtue of its acquired market power. The combined defendants are abusing VIP's veterinarian status to acquire significant quantities of unmeasured pet medications not necessary for their nationwide network of pet treatment facilities, and re-selling or diverting them to retailers, thereby foreclosing competition from other wholesaler/distributors such as plaintiffs. If left unchecked, PetIQ will be able to unilaterally raise prices to retailers and/or distort inter-brand competition.

12.     Defendants' transaction establishes a single distributor for several competing veterinary pharmaceutical manufacturers, which will likely facilitate inter-brand coordination on price and other coordinated effects. The likely direct effects of the transaction, therefore, are to consolidate dominance of distribution for multiple rival manufacturers of unmeasured pet wellness and medication products, to foreclose rival wholesalers from their customers, and depriving retailers of a competitive choice of wholesale distributors.

13.     The result of the challenged acquisition, therefore, is to substantially lessen competition or tend to create a monopoly in the defined market which violates Section 7 of the Clayton Act (Count I). Defendants have also succeeded in monopolizing the wholesale distribution to non-veterinary retailers of unmeasured veterinary wellness and medication products, in violation of Section 2 of the Sherman Act, (Count II) or have violated Section 2 by attempting to do so (Count III).

14.     As a result of defendants' acquisition transaction, the entire customer base of plaintiff Bay Medical, a wholesaler of unmeasured product (Frontline Plus), has been foreclosed to it and it is no longer in business. Plaintiff, Med Vets, a wholesaler of unmeasured prescription veterinary products, is being foreclosed from supplying the market and threatened by the dominance of PetIQ. Plaintiffs seek equitable relief, treble damages, attorneys' fees, and costs of this action.

## II.     THE PARTIES

15.     Plaintiff, MED VETS INC. ("Med Vets"), is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Florida, with its headquarters at 10811 Sunset Plaza Circle, Suite 406, Ft. Myers, FL 33908. Med Vets is a licensed wholesale distributor of

FIRST AMENDED COMPLAINT (Sherman and Clayton Acts)

unmeasured veterinary pharmaceutical products to non-veterinary retailers, mostly those requiring a prescription from a veterinarian to be lawfully purchased by a consumer.

16.     Plaintiff, BAY MEDICAL SOLUTIONS INC. ("Bay Medical"), is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Florida, with its headquarters at 10811 Sunset Plaza Circle, Suite 406, Ft. Myers, FL 33908. Bay Medical, under common ownership with Med Vets, is a wholesale distributor of unmeasured over-the-counter ("OTC") pet medications to non-veterinary retailers, principally, Frontline Plus, a market leading flea and tick control parasiticide.

17.     Defendant, VIP PETCARE HOLDINGS, INC., successor in interest to COMMUNITY VETERINARY CLINICS, LLC d/b/a VIP Petcare ("VIP"), is a corporation organized, existing, and doing business under and by virtue of the laws of the State of California, with its headquarters at 5813 Skylane Blvd., Windsor, CA 95401. Pre-merger, VIP operated veterinary clinics around the country and also distributed unmeasured pet medications through the wholesale market to non-veterinary retailers. It competed with both PetIQ and plaintiffs.

18.     Defendant, PETIQ, INC. ("PetIQ"), is a publicly-held corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its headquarters at 500 E. Shore Drive, Suite 120, Eagle, ID 83616. PetIQ is also a wholesale distributor of unmeasured OTC pet medications to non-veterinary retailers and manufactures and distributes a line of "generic" versions of well-known pet medications and products. PetIQ distributes such products to Walmart, Target, Kroger, Albertsons, Publix, Meijer, Costco, Sam's Club, BJ's Wholesale Club, PetSmart, Petco, Phillips Pet Food and Supplies, Animal Supply Co., Amazon.com, Chewy.com, Walmart.com, Jet.com, PetSmart.com, PetCo.com, and others.  As a result of the VIP acquisition, it now operates one of the largest veterinary clinic conglomerates in the U.S. and is able to steer significant amounts of unmeasured pet wellness and medication products to itself and to the detriment of competition.

### III.     JURISDICTION AND VENUE

19.     This court has subject matter jurisdiction and jurisdiction over the parties pursuant to 28 U.S.C. §§ 1331 and 1337 and over the federal antitrust claims asserted herein under Section 16 of the Clayton Act, 15 U.S.C. § 26, Section 4 of the Clayton Act, 15 U.S.C. §15, Section 7 of the Clayton Act,

FIRST AMENDED COMPLAINT (Sherman and Clayton Acts)

1   15 U.S.C. § 18, Section 2 of the Clayton Act, 15 U.S.C. § 13, and Section 2 of the Sherman Act, 15

2   U.S.C. § 2.

3       20.     Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22,

4   and 28 U.S.C. § 1391, in that this case involves the acquisition of the ownership of VIP, a California

5   domestic corporation. Both defendants are found and transact business in the Northern District of

6   California and throughout the United States.

7                              **IV.    TRADE AND COMMERCE**

8       21.     Defendants are engaged in "commerce," as defined in Section 1 of the Clayton Act, 15

9   U.S.C. § 12(a). The wholesale distribution to non-veterinary retailers of unmeasured pet wellness and

10  medication products is a distinct "line of commerce" within the meaning of Section 7 of the Clayton

11  Act, 15 U.S.C. § 18. Defendants' transactions and conduct has and will have a substantial, direct, and

12  reasonably foreseeable effect on interstate commerce. The goods referred to herein as being the subject

13  of price discrimination were sold across state lines.

14                             **V.    THE TRANSACTION**

15      22.     Under an agreement announced on January 8, 2018 and consummated on January 17,

16  2018, defendant PetIQ, through a wholly-owned subsidiary, acquired the clinical and veterinary and

17  wholesale distribution business of defendant VIP. For years, VIP had diverted significant quantities of

18  unmeasured pet wellness and medication products manufactured by Merial to non-veterinary retailers

19  through the wholesale market. The transaction therefore bridged and solidified the relationship between

20  PetIQ and Merial, makers of Frontline Plus, HEARTGARD, Nexgard, and other widely recommended

21  or prescribed products. Immediately after the VIP acquisition, Ms. Susan Sholtis, formerly the head of

22  North American commercial operations for Merial, was appointed to PetIQ's Board of Directors on

23  March 19, 2018.  She was appointed President of PetIQ on October 1, 2018. PetIQ's press release states

24  that Ms. Sholtis "spent eight years at Merial beginning in 1996 where she most recently had global

25  responsibility for managing two of the largest brands in animal healthcare, FRONTLINE® and

26  HEARTGARD®." Given Ms. Sholtis's history with Merial, PetIQ can steer Merial's product to itself

27  on favorable terms, including not only product price, but also duration (a function of the product's

28

FIRST AMENDED COMPLAINT (Sherman and Clayton Acts)

expiration date), quantity, packaging, bundled discounts, and financing, and thereby foreclose competitors.

23.     In sum, the merged entity will have the ability and incentive to dominate and monopolize the market for wholesale distribution to non-veterinary retailers of unmeasured veterinary wellness and medication products. Manufacturers, such as Merial, stand to benefit from the creation of a single, dominant gateway for unmeasured products, giving them greater control over secondary distribution to retailers. The transaction violates Section 7 of the Clayton Act because it substantially may lessen competition in the alleged product market.

## VI.     THE RELEVANT MARKET

24.     The relevant product market is the wholesale distribution to non-veterinary retailers of unmeasured veterinary wellness and medication products. The market, therefore, is defined by type of customer: non-veterinarian retailer. According to the U.S. Department of Justice and Federal Trade Commission *Horizontal Merger Guidelines* (issued August 19, 2010), "If a hypothetical monopolist could profitably target a subset of customers for price increases, the Agencies may identify relevant markets defined around those targeted customers … the Agencies often define markets for groups of targeted customers, i.e., by type of customer, rather than by individual customer."[2] As alleged above, the secondary distribution system is the only mechanism through which retailers can obtain unmeasured veterinary wellness and medication products. As a result, the customers—retailers—could not and would not switch to a different distribution source if a small but significant and non-transitory increase in the price of unmeasured veterinary wellness and medication products were imposed by a hypothetical monopolist of the secondary distribution system. For the reasons alleged above, animal health manufacturers do not serve as a substitute source of pet wellness and medication products for non-veterinary retailers.

---

[2] Product market definitions based on a particular mode of distribution that serve the needs of a distinct type of customer have been upheld in many merger cases. See, *e.g.*, *Fed. Trade Comm'n. v. Staples, Inc. and Office Depot, Inc.*, 970 F. Supp.1066, 1074 (D.C.D.C. 1997) (relevant product market definition is the sale of consumable office supplies through office supply superstores); *Fed. Trade Comm'n. v. Sysco Corp. and U.S. Foods, Inc.*, 113 F. Supp.3d 1, 26 (D.C.D.C. 2015) (relevant product market definition is "not any particular food item sold or delivered by defendants, but the full panoply of products and services offered by them that customers recognize as 'broadline distribution.'")

FIRST AMENDED COMPLAINT (Sherman and Clayton Acts)

25.     The relevant geographic market for distributing unmeasured veterinary wellness and medication products is the United States.

26.     The 2015 FTC *Report* identified four general categories of unmeasured pet medications: Parasiticides, Vaccines, Antibiotics, and Analgesics. Of these, parasiticides account for approximately 40% of market sales. These products are preventative medications against conditions such as fleas, ticks, and heartworm. They constitute the most significant economic category of pet medications because they must be continually purchased to maintain the wellness of the animal. These are the principal pet wellness and medication products sold by non-veterinary retailers.

## VII.    THE DISTRIBUTION SYSTEM

27.     Animal health manufacturers customarily have limited distribution (or claim to limit distribution) of pet wellness and medication products to veterinary clinics to maintain high prices. But, inevitably, such products—particularly preventative medications that must be repeatedly purchased—show up on the shelves of non-veterinarian retailers and through on-line merchants.

28.     In February 2010, Bayer Animal Health ended its decades-old policy of selling its Advantage and K-9 Advantix flea and tick prevention products exclusively through veterinarians. In response, Bayer's rival, Eli Lilly's Elanco, issued a widely-disseminated call-to-arms in a letter to U.S. veterinarians that stated:

> Your business is at a crossroad. Will you stand by and watch while industry "leaders" redirect patients outside your office for veterinary products? Will you endorse companies which disrespect your profession and redirect patients to other sources? Or will you support companies whose words are supported by action? At Elanco, we believe it is critically important to align actions and words. We believe our unwavering commitment to veterinarians, demonstrated through innovative product introductions and methods of keeping our products within the veterinary channel, demonstrate our support to you and your practice.

29.     Merial also responded to Bayer with a letter to veterinarians. Merial's then U.S. Operations President wrote, "Merial's policy has always been to sell Frontline products only to licensed practicing veterinarians. I want to personally assure you that this policy remains unchanged. So if you hear that Frontline products are 'going OTC,' it isn't true."

FIRST AMENDED COMPLAINT (Sherman and Clayton Acts)

30.     Bayer Animal Health remains the only major veterinary pharmaceutical manufacturer that has broken from the pack by openly supporting the sale of its pet medications by retailers, pharmacies, and on-line merchants.

31.     Nonetheless, by 2015, a robust mechanism emerged by which retailers could obtain supplies from manufacturers such as Elanco and Merial through the secondary distribution system. Several competitors entered the wholesale market so that unmeasured veterinary wellness and medication products could be purchased by retailers from a variety of sources. Secondary distribution increased competition and put downward pressure on veterinarian-sold pet wellness and medication products.

32.     As part of their common scheme to dominate the wholesale market for unmeasured pet wellness and medication products, VIP and PetIQ first targeted the distributors specializing in the sale of Merial's Frontline Plus. Several distributors, including plaintiff Bay Medical, quickly lost all of their retail business to VIP. VIP was supplied with product for wholesale distribution from Merial at preferential prices and/or with longer shelf life, and PetIQ resold those supplies to retailers. Plaintiff, Bay Medical, and other distributors of unmeasured OTC pet wellness and medication products, were foreclosed from the market. This arrangement was followed by the outright acquisition of VIP by PetIQ on January 17, 2018, which now also dominates the wholesale distribution of unmeasured *prescription* veterinary wellness and medication products.

33.     Today, according to a presentation at a Jefferies 2018 Consumer Conference on June 19-20, 2018 in Nantucket, MA, defendant PetIQ now claims to distribute a "95% Share of Rx in Retail" and 90% of "direct purchasing from animal health suppliers" for delivery to retailers. Together these two product categories comprise the relevant product market. PetIQ touted its dominance in the following pages from its slide presentation from the conference:[3]

---

[3] The complete slide presentation has been previously filed in the docket in this case as "Exhibit A" to Plaintiffs' Motion for Limited Expedited Discovery, Doc. No. 38-3.

FIRST AMENDED COMPLAINT (Sherman and Clayton Acts)





34.     On May 15, 2018, PetIQ's CEO, McCord Christensen, speaking on an investor conference call, enthusiastically reported that post-acquisition, 64% of PetIQ sales were to unmeasured accounts. *PetIQ's CEO McCord Christensen on Q1 2018 Results – Earnings Call Transcript*, at 9/23.[4] Thus, in the first quarter of 2018, only 36% of PetIQ's sales were through its legacy business of selling measured accounts that report through Nielsen. "Unmeasured accounts are doing extremely well," said Mr. Christensen, "and made up for any disappointment we would have had in the measured accounts." *Id.* The PetIQ CEO was referring to the disappointment in measured sales the company would have had *without the unmeasured sales from the VIP acquisition*. "This is the first time I've ever communicated that our measured accounts that report through Nielsen in Q1 was 36% of our business," Mr. Christensen said, "which means unmeasured accounts were 64%." *Id.*

---

[4] Downloaded from https://seekingalpha.com/article/4174496-petiqs-petiq-ceo-mccord-christensen-q1-2018-results-earnings-call-transcript?part=single

FIRST AMENDED COMPLAINT (Sherman and Clayton Acts)

35.     Manufacturers continue to insist that distribution of their products is limited to veterinarians, even as large volumes of these products are sold by PetIQ to non-veterinarian retailers.

## VIII.   ANTICOMPETITIVE EFFECTS

36.     With PetIQ as the dominant distributor of unmeasured veterinary wellness and medication products to retailers, it can profitably benefit from its dominance by raising prices, decreasing output, and affecting inter-brand competition.

37.     As a result of the acquisition, rival distributors, such as plaintiffs, Southeastern Veterinary Exports, Lambert Vet Supply, Rainbow Vet Supply, Pet Vet Supplies, and other distributors not known to plaintiffs, are being foreclosed from the retail customer base and have been or may be forced to exit the market. The opaqueness of the industry and dearth of any sales measurements precludes plaintiffs from estimating the remaining secondary distributors' market shares at this stage of the litigation.[5] But, with PetIQ reporting that it controls over 90% of the market, no other secondary distributor could serve as a constraint on defendants' ability to raise prices. And, the direct effect of the transaction is to consolidate dominance of distribution for multiple rival manufacturers of unmeasured pet wellness and medication products and to foreclose rival wholesalers from their customers. As a result of the elimination of VIP as a wholesaler, PetIQ's resulting dominant position as distributor of unmeasured product deprives retailers of a competitive choice of wholesale distributors and deprives competitors, such as plaintiffs, access to retailer customers.

38.     Defendants' transaction establishes a single distributor for several competing veterinary pharmaceutical manufacturers and is likely to facilitate inter-brand coordination on price and other coordinated effects.

---

[5] Plaintiffs' Motion for Limited Expedited Discovery of Defendants' HSR filings, which requires the filer to estimate competitors' market shares, was denied in the Court's *Order Denying Plaintiffs' Motion for Limited Expedited Discovery; Extending Deadline to File First Amended Complaint*, Nov. 28, 2018, Doc. No. 45. Other potential sources regarding wholesale distribution of unmeasured veterinary products have been unavailing. A veterinary industry economist reported, "I have been unable to get anyone to talk about distribution specifics in the veterinary pharmacy space. That being the case I don't think there is any hard proof the manufacturers have openly created new channels directly to retailers. In talking with some of the prominent veterinarians in the profession they categorize these types of relationships as 'leakages' more than industry wide practice."

FIRST AMENDED COMPLAINT (Sherman and Clayton Acts)

39.     Entry of new distributors into the relevant market is unlikely to prevent or remedy the anticompetitive effects of defendants' transaction or conduct. Offering such distribution services requires veterinary licensing and other regulatory authorizations and appropriate relationships with manufacturers and retailers. A new entrant would find it practically impossible to establish and cultivate the business relationships necessary to provide distribution services in competition with PetIQ.

40.     The transaction does not generate verifiable, merger-specific efficiencies in the relevant market sufficient to reverse or outweigh the anticompetitive effects likely to occur and have occurred. The parties' arrangements and co-ownership create no additional or unique improvements or greater efficiencies than a market with multiple distributors. Any savings resulting from the parties' transaction will inure only to the profits of the enterprise and will result in no price or non-price retailer or consumer benefits.

41.     The transaction substantially may lessen competition in the market for distribution of unmeasured veterinary wellness and medication products and is likely to lower the output and raise the prices of those products. The merger has created a monopoly in the relevant market or created a dangerous probability that PetIQ will succeed in monopolizing the relevant market.

## IX.     ANTITRUST INJURY

42.     As a direct, proximate, and foreseeable result of defendants' transaction and antecedent conduct, plaintiffs have been injured in their business and property or are threatened with such injury. Plaintiff Bay Medical has been excluded as a distributor of OTC pet wellness product to non-veterinarian retailers, and plaintiff Med Vets is threatened with exclusion from the distribution of prescription pet wellness and medication products and have no adequate remedy at law.

## X.     VIOLATIONS ALLEGED

43.     Plaintiffs incorporate the allegations of paragraphs 1 through 42 above as if fully set forth in each Count herein.

## COUNT I

## (Unlawful Merger in Violation of the Clayton Act § 7)

(All defendants)

FIRST AMENDED COMPLAINT (Sherman and Clayton Acts)

44.     Plaintiffs bring Count I under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain the defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. The likely effect of the defendants' acquisition will be to lessen competition substantially in a line of interstate trade and commerce, *to-wit*: the wholesale distribution to non-veterinary retailers of unmeasured veterinary wellness and medication products, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

45.     Plaintiffs are threatened with the loss of their business and property and other irreparable harm from the violation and have no adequate remedy at law.

**COUNT II**

**(Monopolization in Violation of the Sherman Act § 2)**

(All defendants)

46.     Plaintiffs bring Count II under Section 4 of the Clayton Act, 15 U.S.C. § 15 and Section 16 of the Clayton Act, 15 U.S.C. § 26, for damages and injunctive relief against defendants, jointly and severally, for violating Section 2 of the Sherman Act, 15 U.S.C. § 2. Defendants' coordinated conduct and acquisition transaction has created a monopoly in the market for wholesale distribution to non-veterinary retailers of unmeasured veterinary wellness and medication products, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, as described herein.

47.     As a direct and proximate result of the foregoing, plaintiffs have lost their business and property and are threatened with additional loss and injury for which there is no adequate remedy at law.

**COUNT III**

**(Attempted Monopolization in Violation of the Sherman Act § 2)**

(All defendants)

48.     Plaintiffs bring Count II of this action under Section 4 of the Clayton Act, 15 U.S.C. § 15 and Section 16 of the Clayton Act, 15 U.S.C. § 26, for damages and injunctive relief against defendants, jointly and severally, for violating Section 2 of the Sherman Act, 15 U.S.C. § 2. Defendants' coordinated conduct and acquisition transaction and created a dangerous probability that defendants will succeed in monopolizing the market for wholesale distribution to non-veterinary retailers of unmeasured veterinary wellness and medication products, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, as described herein.

FIRST AMENDED COMPLAINT (Sherman and Clayton Acts)

49.     As a direct and proximate result of the foregoing, plaintiffs have lost their business and property and are threatened with additional loss and injury for which there is no adequate remedy at law.

### XIII.   RELIEF REQUESTED

WHEREFORE, plaintiffs request the following relief:

A.      A declaration that the Pet IQ acquisition of VIP violates Section 7 of the Clayton Act, 15 U.S.C. § 18;

B.      A preliminary order enjoining defendants from proceeding to integrate the acquired companies into the operations of PetIQ and requiring defendants to hold the assets acquired in the transaction separate during the pendency of this litigation;

C.      A temporary order enjoining defendants from soliciting additional contracts from veterinary pharmaceutical manufacturers without prior notification to the Court and to plaintiffs;

D.      A permanent order requiring PetIQ to divest its interests in VIP and for a novation of the January 17, 2018 acquisition;

E.      Three-fold damages directly and proximately caused by defendants' anticompetitive conduct and attempted monopolization of the relevant markets;

F.      An order awarding a reasonable attorneys' fee and the costs of this suit; and,

G.      Such other further temporary and permanent equitable relief as may be reasonably necessary.

### DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury of all issues so triable.

FIRST AMENDED COMPLAINT (Sherman and Clayton Acts)

Dated: December 14, 2018

/s/ Jonathan L. Rubin
Jonathan L. Rubin (*Pro hac vice*)
**MOGINRUBIN LLP**
1615 M Street NW, Third Floor
Washington, DC 20036
Telephone: (202) 630-0616
Facsimile: (866) 726-5741
jrubin@moginrubin.com

Daniel J. Mogin (SBN 95624)
Jodie M. Williams (SBN 247848)
Jennifer M. Oliver (SBN 311196)
**MOGINRUBIN LLP**
One America Plaza, Suite 3300
600 West Broadway
San Diego, CA 92101
Telephone: (619) 687-6611
Facsimile: (619) 687-6610
dmogin@moginrubin.com
jwilliams@moginrubin.com
joliver@moginrubin.com

*Counsel for Plaintiffs*

FIRST AMENDED COMPLAINT (Sherman and Clayton Acts)