IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MED VETS INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>VIP PETCARE HOLDINGS, INC., et al.,<br><br>Defendants. | Case No. 18-cv-02054-MMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Re: Dkt. No. 51 |

Before the Court is the "Motion to Dismiss Plaintiffs' First Amended Complaint," filed January 15, 2019, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, by defendants VIP Petcare Holdings, Inc. ("VIP") and PetIQ, Inc. ("PetIQ"). On January 29, 2019, plaintiffs Med Vets Inc. ("Med Vets") and Bay Medical Solutions Inc. ("Bay Medical") filed opposition, to which defendants, on February 5, 2019, replied.

Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.[1]

## BACKGROUND

Plaintiffs are wholesale distributors who specialize in the distribution of pet products, namely, prescription medications and certain over-the-counter ("OTC") medications. Plaintiffs have access to such products despite a policy whereby major animal-health manufacturers claim to limit the sale thereof to veterinary practices and pharmacies. In particular, a "secondary distribution system" exists, whereby plaintiffs and other wholesale distributors obtain these ostensibly restricted items and resell them to

---

[1] By order filed February 26, 2019, the Court took the motion under submission.

retailers. (See First Am. Compl., filed Dec. 14, 2018 ("FAC"), ¶ 6.)[2]

VIP "operates veterinary clinics" and "has served as an important independent wholesale source for distributors." (See id. ¶ 3.) PetIQ is a wholesale distributor of OTC pet products "to virtually every significant retailer in the U.S." (See id.)[3] On January 17, 2018, PetIQ acquired VIP.

According to plaintiffs, defendants "are using VIP's veterinarian status to acquire large quantities" of the above-referenced products "for the purpose of re-selling . . . them to PetIQ for sale to retailers" (see id.), thereby "remov[ing] an independent competitor, VIP, from the market" (see id. ¶ 1) and "foreclosing competition from other wholesaler/distributors" such as themselves (see id. ¶ 3).

Based on the above, plaintiffs bring the instant action, which has proceeded as follows.

On April 4, 2018, plaintiffs filed their initial complaint, challenging the above-described merger, and asserting claims under the Clayton Act and Sherman Act. In said pleading, plaintiffs identified two "relevant . . . product markets," namely, "the wholesale markets for prescription and restricted pet parasiticides for distribution to non-veterinary retailers (the secondary distribution system for prescription and restricted OTC pet parasiticides, respectively)." (See Compl., filed Apr. 4, 2018, ¶ 29.)

On June 1, 2018, defendants moved to dismiss the complaint. Thereafter, on August 3, 2018, the Court granted the motion, finding plaintiffs had not "pled a plausible market" (see Tr. of Proceedings for Aug. 3, 2018, at 44:20), and, in light of plaintiffs' request for sixty days to conduct additional investigation, gave plaintiffs leave to file, by October 5, 2018, an amended complaint.

On October 3, 2018, plaintiffs, rather than filing an amended complaint, filed a

---

[2] Unless otherwise noted, the court, like the parties, uses the term "retailers" to refer to non-veterinary retailers.

[3] PetIQ also manufactures and distributes a line of generic pet medications and products (see FAC ¶ 18), an aspect of its business that is not at issue in the instant case.

2

1 "Motion for Limited Expedited Discovery," whereby plaintiffs sought to obtain "a copy of defendants' Notification and Report Form[] submitted to the DOJ/FTC [Department of Justice/Federal Trade Commission] Pre-Merger Notification Office" prior to the merger (see Mot. for Ltd. Expedited Disc., filed Oct. 3, 2018, at 6:22–23), which notification, plaintiffs asserted, would provide relevant market information not otherwise available to plaintiffs (see id. at 11:26–28 (stating "HSR Notification and Report Form" requires defendants to identify their competitors and product markets, estimate market concentration, and explain anticipated competitive effects of merger)). In connection with said motion, plaintiffs attached a proposed First Amended Complaint ("PFAC"), in which they defined the "relevant . . . markets" in essentially the same terms as in their original complaint. (See PFAC, filed Oct. 3, 2018, ¶ 32.)

On October 26, 2018, in response to defendant's opposition, plaintiffs filed a reply accompanied by a "Restated" proposed First Amended Complaint ("RPFAC") (see RPFAC, filed Oct. 26, 2018), in which plaintiffs defined the relevant markets by reference to services provided, rather than by the above-referenced products themselves. In particular, plaintiffs identified the "relevant . . . markets" as "the distributing and wholesaling services involved in distributing prescription and restricted pet parasiticides." (See id. ¶ 32.)

By order filed November 28, 2018, the Court denied plaintiffs' motion for expedited discovery, and extended to December 14, 2018, the deadline to file an amended complaint, whether "with or without modification of the most recently proposed version." (See Order Den. Pls.' Mot., filed Nov. 28, 2018, at 5:16–17.)

On December 14, 2018, plaintiffs filed a third document titled First Amended Complaint, this time focusing on the distribution channel, omitting the limitation to pet parasiticides, and identifying a single "relevant . . . market," namely, "the wholesale distribution to non-veterinary retailers of unmeasured veterinary wellness and medication

products." (See FAC ¶ 24.)[4]

By the instant motion, defendants seek an order dismissing the FAC with prejudice.

**LEGAL STANDARD**

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). Rule 8(a)(2), however, "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). Consequently, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." See id. Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." See id. (internal quotation, citation, and alteration omitted).

In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint and construe them in the light most favorable to the nonmoving party. See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). "To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" Twombly, 550 U.S. at 555. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." See Iqbal, 556 U.S. at 678 (internal quotation and citation omitted).

Generally, a district court, in ruling on a Rule 12(b)(6) motion, may not consider

---

[4] As discussed below, plaintiffs use the term "unmeasured" to refer to products that are carried by retailers, but for which sales to consumers are "not tracked" by "retail measurement firms." (See FAC ¶ 4.)

4

any material beyond the complaint. See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). Documents whose contents are alleged in the complaint, and whose authenticity no party questions, but which are not physically attached to the pleading, however, may be considered. See Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994). In addition, the Court may consider matters that are subject to judicial notice. See Mack v. South Bay Beer Distribs., Inc., 798 F.2d 1279, 1282 (9th Cir. 1986). Notably, a court "need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." See In re Gilead Sci. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation and citation omitted).

## DISCUSSION

Plaintiffs challenge defendants' merger on the theory its effect "may be substantially to lessen competition or tend to create a monopoly." (See FAC ¶ 1.) In particular, plaintiffs bring three claims, namely: (1) "Unlawful Merger," in violation of Section 7 of the Clayton Act (see id. at 13:26); (2) "Monopolization," in violation of Section 2 of the Sherman Act (see id. at 14:9); and (3) "Attempted Monopolization," in violation of Section 2 of the Sherman Act (see id. at 14:20).

Section 7 of the Clayton Act prohibits persons "engaged in commerce or in any activity affecting commerce" from acquiring "the whole or any part of the stock or other share capital . . . of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce . . ., the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." See 15 U.S.C. § 18. Section 2 of the Sherman Act makes it a felony to "monopolize, or attempt to monopolize, . . . any part of the trade or commerce among the several States." See 15 U.S.C. § 2.

Where, as here, plaintiffs bring claims under Section 7 of the Clayton Act and Section 2 of the Sherman Act, they must allege a relevant market in which defendants have market power. See United States v. E.I. du Pont de Nemours & Co., 353 U.S. 586, 593 (1957) (holding, for claim under Clayton Act § 7, "determination of the relevant

5

market is a necessary predicate"); <u>Newcal Indus., Inc. v. Ikon Office Solution</u>, 513 F.3d 1038, 1044 (9th Cir. 2008) (holding, "[i]n order to state a valid claim under the Sherman Act, a plaintiff must allege . . . both that a 'relevant market' exists" and that the defendant has power within that market"); <u>see also</u> <u>United States v. Continental Can Co.</u>, 378 U.S. 441, 458 (1964) (holding Clayton Act § 7 is "design[ed] to prevent undue concentration"; noting "[m]arket shares are the primary indicia of market power"); <u>Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.</u>, 433 Fed. App'x 598, 598 (9th Cir. 2011) (holding, in case with claims under both Clayton Act and Sherman Act, "[i]n order to state an antitrust claim, a plaintiff must identify a relevant market within which the defendant has market power").

Defendants challenge all three claims against them on the basis that plaintiffs have failed to allege "market power in a relevant market." (<u>See</u> Defs.' Mot. to Dism. Pls.' FAC at 8:22.)

**A.  Relevant Market**

Although "the validity of the 'relevant market' is typically a factual element rather than a legal element," <u>see Newcal Indus.</u>, 513 F.3d at 1045, "[a] complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable," <u>see id.</u> "First and foremost, the relevant market must be a <u>product</u> market." <u>See</u> <u>id.</u> (emphasis in original) (explaining "consumers do not define the boundaries of the market; the products or producers do").[5] The product market "must encompass the product at issue as well as all economic substitutes for the product," <u>see id.</u>; <u>see also</u> <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 325 (1962) (holding "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it").

---

[5] Antitrust law also requires allegation of "a geographic market." <u>See</u> <u>Newcal Indus.</u>, 513 F.3d at 1045 n.4. As defendants do not dispute plaintiffs' alleged geographic market, namely, "the United States" (<u>see</u> FAC ¶ 25), the Court does not address such issue further herein.

6

Here, as noted above, plaintiffs, in the instant complaint, allege a single market, namely, "the wholesale distribution to non-veterinary retailers of unmeasured veterinary wellness and medication products." (See FAC ¶¶ 1, 24.)[6] According to plaintiffs, "[m]easured products are those that are tracked by retail measurement services" (see id. ¶ 2), and "[u]nmeasured products are available in retail stores . . ., but sales of these products are not tracked" by such services (see id.).[7] As also noted above, however, a relevant market is defined by the products themselves or their producers. See Newcal Indus., 513 F.3d at 1045. A market definition based on whether one or more business entities find it economically advantageous to collect and publish certain types of sales data is facially unsustainable.

Moreover, the FAC, absent some other modifier or means of delineation, provides no meaningful way to otherwise identify a product market. First, as to "veterinary wellness and medication products," one cannot determine what types of products are encompassed by the term "wellness," which plaintiffs do not define and which could include products ranging from pet food and exercise equipment to training aids. Similarly, as to "medication," although, as plaintiffs allege, the FTC identified, in a 2015 report, four categories of "pet medications,"[8] it did not, contrary to plaintiffs' allegation, identify those products as "unmeasured." (See FAC ¶ 26.) Indeed, the FTC did not even limit pet medications to those four categories or define them in the same way as plaintiffs.

---

[6] Although defendants contend "the end user pet owner[] is the appropriate customer" (see Mot. to Dism. at 11:1), the Court, for purposes of the instant analysis, assumes the appropriate customer is, as plaintiffs contend, the non-veterinarian retailer.

[7] The Court finds it unnecessary to address herein defendants' contention that, contrary to plaintiffs' allegations, "measured" and "unmeasured" are not used in connection with "products," but, rather, with "accounts" (see Mot. to Dism. at 12–13), i.e., retailers, who, according to defendants, "themselves determine whether or not to share sales data with measurement firms" (see id. at 13:3–4).

[8] While it appears plaintiffs use "veterinary" and "pet" interchangeably (see, e.g., FAC ¶¶ 1, 21), the two terms ordinarily are not interchangeable, the former encompassing a wide variety of animals not ordinarily kept as "pets," and, consequently, plaintiffs' use of both terms introduces into plaintiffs' market definition an additional measure of ambiguity.

7

(Compare id. (describing four categories as follows: "Parasiticides, Vaccines, Antibiotics, and Analgesics") with Defs.' Req. for Jud. Not., filed Jan. 15, 2019 ("RJN"), Ex. 2 (FTC report) at 17 (noting "[m]ost of the pet medications available to U.S. consumers can be classified into four areas: (1) parasiticides (e.g., flea/tick/heartworm); (2) vaccines; (3) anti-infectives (e.g., antibiotics); and (4) anti-inflammatory (e.g., non-steroidal anti-inflammatory drugs, 'NSAIDs')" (emphasis added)); see also id. at 1 n.2 (noting "[t]his report does not purport to identify any relevant product market for antitrust law enforcement purposes").[9]

Further, elsewhere in the FAC, plaintiffs allege "two product categories comprise the relevant product market" (see FAC ¶ 33), namely, "Rx in Retail" and "'direct purchasing from animal health suppliers' for delivery to retailers" (see id.). Even assuming the first such category corresponds to prescription products, the second has no meaningful boundaries.

In addition, apart from the above-referenced deficiencies in plaintiffs' product definition, plaintiffs define the market too narrowly with respect to its participants, whether actual or potential. See Newcal Indus., 513 F.3d at 1045 (holding relevant market "must include the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business") (internal quotation and citation omitted). In particular, plaintiffs allege the secondary distribution system is the "only mechanism through which retailers can obtain unmeasured veterinary wellness and medication products." (See FAC ¶ 24.) The FAC does not, however, include any factual allegations to support such conclusory assertion. Further, as set forth below, plaintiffs' exclusion of veterinarians and manufacturers conflicts with various allegations in their FAC, as well as with allegations in their prior pleadings and statements in the FTC report

---

[9] Defendants' unopposed Request for Judicial Notice is hereby GRANTED as to the above-cited report, as well as each of the other documents attached thereto, namely: (1) a copy of "PetIQ's June 19–20, 2018 Jefferies Consumer Conference presentation" (see RJN at 1:5–6 & Ex. 1); and (2) a copy of "PetIQ's May 15, 2018 Quarter 1 earnings call transcript" (see id. at 1:10–11 & Ex. 3).

8

on which plaintiffs have relied.

First, as to veterinarians, given that, in the FAC, plaintiffs identify VIP, which operates veterinary clinics, as a pre-merger "horizontal competitor" in the market (see id. ¶ 11) and as having "competed with both PetIQ and plaintiffs" (see id. ¶ 17), it is not tenable to exclude veterinarians from the alleged market. See, e.g., United States v. Topco, 405 U.S. 596, 608 (1972) (referring to "competitors at the same level of the market" as "horizontal").

Next, plaintiffs' exclusion of manufacturers conflicts with factual allegations in each of the prior iterations of their complaint, specifically, allegations that retailers also obtain pet medications from manufacturers and their approved distributors. (See Compl. ¶ 3 (alleging "retail outlet[s]" are "supplied" both "directly by a manufacturer or its distributor" and "by the 'secondary distribution system'"); PFAC ¶ 3 (same); RPFAC ¶ 3 (same)); see also Royal Primo Corp. v. Whitewater West Indus., Ltd., 2016 WL 1718196, at *3 (N.D. Cal. Apr. 29, 2016) (holding court "may look to prior pleadings in determining the plausibility of an amended complaint"). Further, the exclusion of manufacturers is inconsistent with other allegations in the FAC and with the FTC report. (See FAC ¶ 30 (alleging Bayer, a "major veterinary pharmaceutical manufacturer, . . . support[s] the sales of its pet medications by retailers, pharmacies, and on-line merchants"); see also RJN Ex. 2 (FTC report) at 4 (stating "some manufacturers . . . supply . . . non-veterinary retailers"); id. at 20 (noting "[s]ome stakeholders report that . . . large retail pharmacies and stores have been able to purchase pet medications directly from the manufacturers").

In sum, for all of the above reasons, the Court finds plaintiffs' proposed market is not facially sustainable and, consequently, the FAC is subject to dismissal. See Newcal Indus., 513 F.3d at 1045; see also Hicks v. PGA Tour, Inc., 897 F.3d 1109, 1123 (9th Cir. 2018) (affirming dismissal of antitrust complaint where proposed markets were "facially unsustainable") (internal quotation and citation omitted).

**B.  Market Power**

As noted above, in addition to alleging a relevant market, plaintiffs must also

allege defendants have market power in such market. "Market power is the power to force a purchaser to do something that he would not do in a competitive market." Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 464 (1992) (explaining market power "has been defined as the ability of a single seller to raise price and restrict output") (internal quotations and citations omitted). "A failure to allege power in the relevant market is a sufficient ground to dismiss an antitrust complaint." Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC, 532 F.3d 963, 972 (9th Cir. 2008).

"Market power may be demonstrated through either of two types of proof": (1) "direct evidence of the injurious exercise of market power"; or (2) "circumstantial evidence pertaining to the structure of the market." See Rebel Oil Co., Inc. v. Atlantic Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995). Direct evidence includes "evidence of restricted output and supracompetitive prices." See id.; see also Oltz v. St. Peter's Cmty. Hosp., 861 F.2d 1440, 1448 (9th Cir. 1988) (holding "proof of actual detrimental effects such as a reduction of output can obviate the need for elaborate market analysis"; noting "the finding of actual harm to competition suffices") (internal quotation and alterations omitted). To show market power circumstantially, a plaintiff must: "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and . . . that existing competitors lack the capacity to increase their output in the short run." See Rebel Oil, 51 F.3d at 1434; see also Eastman Kodak, 504 U.S. at 464 (defining market power as "the ability of a single seller to raise price and restrict output"; holding "[t]he existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market") (internal quotation and citation omitted). Here, even assuming, arguendo, plaintiffs have alleged a plausible market, plaintiffs, as set forth below, have failed to allege facts sufficient to show, either directly or circumstantially, that defendants possess the requisite market power.

Plaintiffs allege PetIQ, as a result of the merger, "has come to dominate the secondary distribution market and forced other secondary distributors to exit by virtue of

10

its acquired market power."  (See FAC ¶ 11.)  To the extent plaintiffs rely on direct evidence, such reliance is unavailing.  Plaintiffs have not alleged any output restriction or supracompetitive pricing; indeed, as to price, plaintiffs do not allege any increase at all. Nor have plaintiffs alleged any other "actual harm" to competition, see Oltz, 861 F.2d at 1448; other than plaintiff Bay Medical, the FAC identifies no wholesale distributor as having been "foreclosed from the market" (see FAC ¶ 32),[10] and, in any event, such "foreclosure" appears to be limited to a single product, "Frontline Plus" (see id.).

Plaintiffs' effort to show market power circumstantially likewise fails.  Plaintiffs allege defendants "claim[] to control over 90%" of the alleged market (see id. ¶ 3; see also ¶ 37),[11] an allegation that is based on a PetIQ presentation slide, which, plaintiffs allege, shows "PetIQ now claims to distribute . . . 90% of 'direct purchasing from animal health suppliers' for delivery to retailers" (see id. ¶ 33).  Plaintiffs have submitted, however, only a portion of the slide (see id. at 11:1–15), whereas a review of the entire slide, titled "Significant Improvements in Our Supply Chain," makes clear the 90% figure pertains to the source of PetIQ's own supply of products for distribution, not its share of the alleged wholesale market.  (See RJN Ex. 3 at 12; see also id. Ex. 1 at 12 (reporting "roughly 90% of our distribution business is through a direct relationship with the animal health manufacturers").)  Plaintiffs' reliance on said exhibit is, consequently, misplaced. See In re Gilead Sci. Sec. Litig., 536 F.3d at 1055; see also Roth v. Garcia Marquez, 942 F.2d 617, 625 n.1 (9th Cir. 1991) (holding, "when the allegations of the complaint are refuted by an attached document, the Court need not accept the allegations as being

---

[10] Plaintiffs allege the other wholesale distributors include, along with plaintiffs, "Southeastern Veterinary Exports, Lambert Vet Supply, Rainbow Vet Supply, Pet Vet Supplies, and other distributors not known to plaintiffs" (see FAC ¶ 37), and then allege, in conclusory and imprecise fashion, such entities "are being foreclosed from the retail customer base and have been or may be forced to exit the market" (see id.) (emphasis added).

[11] Plaintiffs also allege the merger "establishes a single distributor for several competing veterinary pharmaceutical manufacturers" (see FAC ¶¶ 12, 38), but do not identify those manufacturers or provide factual support for said allegation.

11

true").

Next, relying on a different slide, plaintiffs allege PetIQ "claims to distribute a '95% Share of Rx in Retail.'" (See FAC ¶ 33.) Such allegation, although an accurate characterization of the slide's content, does not correspond to the alleged market, which encompasses "unmeasured pet wellness and medication products," a different, and much broader, array of products than prescription products. Notably, plaintiffs have not provided any figures corresponding to PetIQ's share of ostensibly restricted OTC products or its share of prescription and such restricted OTC products combined, nor provided any figures as to what share of the market either defendant possessed prior to the merger. See, e.g., Continental Can, 378 U.S. at 460 (analyzing market power of acquiring firm by reference to market shares possessed, prior to merger, by acquirer and acquiree; finding violation of Clayton Act § 7, where acquisition both "added significantly to [acquirer's] position" and "reduced from five to four the most significant competitors").[12]

Lastly, with respect to the two parts of the final element required for a circumstantial showing of market power, "barriers to entry and barriers to expansion," see Rebel Oil, 51 F.3d at 1439, plaintiffs' allegations are wholly conclusory as to the former and absent as to the latter. As to barriers to entry, plaintiffs allege that "[o]ffering . . . distribution services [in the secondary market] requires veterinary licensing and other regulatory authorizations and appropriate relationships with manufacturers and retailers." (See FAC ¶ 39.) In connection therewith, however, plaintiffs provide no factual elaboration. Plaintiffs do not, for example, include any allegation as to the degree of difficulty involved in obtaining such authorization, nor do they explain their assertion that

---

[12] Plaintiffs' effort to connect the 95% figure, which pertains solely to prescription products, with their alleged market (see Opp'n at 17:21–18:1) (contending "nearly all of the unmeasured products flowing through the secondary distribution channel are prescription" products) is not consistent with their contention that Frontline Plus, an OTC product, "contributes significantly to defendants' dominance over the relevant market" (see id. at 18 n.7), nor is it supported by their citations to the FAC (see, e.g., FAC ¶ 2 (alleging "[m]ost or all of the products served by the relevant market in this case are preventative medications, . . ., both prescription and non-prescription")).

12

it would be "practically impossible" to cultivate the above-referenced business relationships. (See id.) In any event, given plaintiffs' failure to include any allegation bearing on barriers to expansion, the requisite showing has not been made. See Rebel Oil, 51 F.3d at 1434.

In light of the foregoing, the Court finds the FAC is subject to dismissal for failure to allege market power in a relevant market. See Rick-Mik Enters., 532 F.3d at 972.[13]

## C. Leave to Amend

In their opposition, plaintiffs, without providing any additional facts they could allege, request another opportunity to amend.

As discussed above, however, the operative pleading, notwithstanding its title, is in fact the fourth iteration of plaintiffs' complaint, over the course of which filings plaintiffs have repeatedly changed their definition of the relevant market. Last August, at the hearing on defendants' first motion to dismiss, plaintiffs asked the Court for sixty days to amend their complaint. At this point, having been granted not only the requested sixty days, but an additional extension as well, the instant complaint fares no better than its predecessors, and, as noted, plaintiffs have not identified any factual allegations that could be added to cure the above-described deficiencies. In short, it appears plaintiffs have pleaded all the facts they have, and those facts are not sufficient to support their claims. Under such circumstances, the Court finds further leave to amend would be futile. See Dougherty v. City of Covina, 654 F.3d 892, 901 (9th Cir. 2011) (finding leave to amend would be futile where plaintiff failed to allege facts sufficient to state claim and did not identify any additional facts that could be pled); see also Simon v. Value Behavioral Health, Inc., 208 F.3d 1073, 1084 (9th Cir. 2000) (affirming denial of leave to amend antitrust complaint; explaining "[a]lthough it is theoretically possible for [plaintiff] to allege more specific facts, his failure to do so after the district court had given him three

---

[13] Given the above findings as to plaintiffs' failure to allege a relevant market and market power, the Court does not reach defendants' additional arguments in support of dismissal.

13

opportunities to amend his original complaint and had discussed with him the substantive problems with his claims suggests the futility of further amendment"), overruled on other grounds by Odom v. Microsoft Corp., 486 F.3d 541 (9th Cir. 2007) (en banc).

## CONCLUSION

For the reasons stated above, defendants' Motion to Dismiss is hereby GRANTED and the FAC is DISMISSED without further leave to amend.

The Clerk is directed to close the file.

**IT IS SO ORDERED.**

Dated: April 22, 2019

MAXINE M. CHESNEY
United States District Judge